IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Boyd N. Boland

Civil Action No. 08-cv-00882-LTB-BNB

BRO. EDWARD J.X. (FORD), JR.,

Plaintiff,

v.

THE FEDERAL BUREAU OF PRISONS,
HARLEY LAPIN, Director,
SARA REVELL, Warden, U.S.P. Florrence,
MICHAEL MERRILL, Head Chaplain,
PAUL SCHOFIELD, Food Service Administrator, and
PAULA LIVINGGOOD, Food Service Assistant Administrator,

Defendants.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

This matter is before me on **Defendants' Motion for Summary Judgment** [Doc. #102, filed 01/05/2011] (the "Motion"). I respectfully RECOMMEND that the Motion be GRANTED.

## I.  STANDARD OF REVIEW

The plaintiff is proceeding *pro se*, and I must liberally construe his pleadings. Haines v. Kerner, 404 U.S. 519, 520-21 (1972). Nevertheless, I cannot act as advocate for a *pro se* litigant, who must comply with the fundamental requirements of the Federal Rules of Civil Procedure. Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991).

In ruling on a motion for summary judgment, the facts must be viewed in the light most favorable to the party opposing the motion and that party must be afforded the benefit of all reasonable inferences to be drawn from the evidence. Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970). Summary judgment shall be rendered "if the movant shows that there is no

genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating by reference to portions of pleadings, discovery and disclosure materials on file, and any affidavits, the absence of genuine issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial."  Trainor v. Apollo Metal Specialties, Inc., 318 F.3d 976, 979 (10th Cir. 2002).  The party opposing the motion is then required to go beyond the pleadings and designate evidence of specific facts showing that there is a genuine issue for trial.  Celotex, 477 U.S. at 324.  Only admissible evidence may be considered when ruling on a motion for summary judgment.  World of Sleep, Inc. v. La-Z-Boy Chair Co., 756 F.2d 1467, 1474 (10th Cir. 1985).

## II.  BACKGROUND

The plaintiff is currently incarcerated by the Bureau of Prisons ("BOP").  He filed his Amended Prisoner Complaint on December 15, 2008 [Doc. #51] (the "Complaint").  The Complaint alleges that the plaintiff is a member of the Nation of Islam; the Nation of Islam's "dietary laws and practices are an intricate and compulsory component of their faith's belief system and must be carried out in accordance with the divine guidance and instructions of the Messenger of Alla, the Most Honorable, Elijah Muhammad, as presented in *How to Eat to Live* books I and II."; the *How to Eat to Live* books require the plaintiff to maintain a strict vegetarian

diet; he is "steadfast and devoted in his adherence to the dietary requirements (which are a central tenet of his faith) along with all of the other principles, laws, and rules of his religion"; prison officials implemented a new religious diet program in March 2008; and as a result of the new program, the plaintiff is being denied nutritionally adequate meals consistent with the dietary laws of his faith. *Complaint*, p. 3; p. 7, ¶¶ 1, 3; p. 8, ¶¶ 5-6.[1]

The Complaint asserts four claims pursuant to <u>Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics</u>, 403 U.S. 388 (1971). The claims are prolix and redundant. Claims One, Two, and Three can be distilled into one claim: the defendants violated the plaintiff's First Amendment rights, the Religious Freedom Restoration Act ("RFRA"); and the Religious Land Use and Institutionalized Persons Act ("RLUIPA") when they failed to provide the plaintiff with a proper religious diet. *Complaint*, pp. 4, 7-18. Claim Four[2] alleges that the defendants violated the plaintiff's equal protection rights because they are providing proper religious diets to inmates of other religions. <u>Id.</u> at pp. 19-20. The plaintiff seeks declaratory and injunctive relief and compensatory and punitive damages. <u>Id.</u> at pp. 23-24.

---

[1]I cite to the pages of the Complaint as they are assigned by the court's docketing system.

[2]The Complaint contains two claims that are labeled "Claim Two" and two claims that are labeled "Claim Three." <u>Id.</u> at pp. 17, 19. I construe the second "Claim Three" as the plaintiff's fourth claim for relief.

3

### III.   UNDISPUTED MATERIAL FACTS[3]

1.   Harley Lappin is the Director of the Bureau of Prisons.   *Motion*, Ex. A ¶ 3; *Plaintiff's Traverse to Defendant's Motion for Summary Judgment* [Doc. #111] (the "Response"), p. 6, § A.[4]  The individual capacity claims against Director Lappin have been dismissed [Doc. #65].

2.   Sarah Revell was previously the Warden at the United States Penitentiary in Florence, Colorado ("USP Florence").   *Motion*, Ex. A, ¶ 3; *Response*, p. 6, § A.  She is presently the Warden at the U.S. Penitentiary in Butner, North Carolina.  Id.

3.   Michael Merrill was previously the Supervisory Chaplain at USP Florence and is currently the Associate Warden at the Federal Prison Camp in Yankton, South Dakota.  Id.

4.   Paul Scofield[5] was previously the Food Services Administrator at USP Florence and is currently the Regional Food Services Administrator at the BOP's North Central Regional Office.  Id.

---

[3]The plaintiff disputes many of the defendants' factual statements.  In addition, he introduces additional facts in the text of his response to the defendants' Motion.  Most of the plaintiff's facts are stated without any citation to supporting evidence or with citations that do not support the statements.  I do not consider factual statements that are not properly supported with evidence.  "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ."  Fed.R.Civ.P. 56(c)(1)(A).  The court should consider only cited materials.  Fed.R.Civ.P. 56(c)(3).  Moreover, it is not a judicial function to search the plaintiff's 95 pages of exhibits for evidence supporting a particular fact.  See Gross v. Burggraf Construction Co., 53 F.3d 1531, 1546 (10th Cir. 1995).  It is the litigant's responsibility to provide concise arguments, relevant facts, and specific citations to authorities and supporting evidence.  Toth v. Gates Rubber Co., 2000 WL 796068, *8 (10th Cir. 2000).

[4]I cite to the pages numbers of the Response as they are assigned by the court's docketing system.

[5]The plaintiff has misspelled Mr. Scofield's and Ms. Livengood's names.  I use the correct spelling as provided by the defendants.

5.   Paula Livengood was previously the Assistant Food Services Administrator at USP Florence and is currently is the Food Services Administrator at USP Allenwood in Pennsylvania. Id.

6.   The plaintiff is presently serving two life sentences and a consecutive 15-year sentence for two separate counts of murder, a kidnapping charge, and a conspiracy charge. *Motion*, Ex. A, ¶ 4; *Response*, p. 6, § A.

7.   The plaintiff was housed at the United States Penitentiary in Florence Colorado ("USP Florence") from July 1998 until April 19, 2010.  Id.  He was then transferred to the Federal Correctional Institution in Schuylkill, Pennsylvania ("FCI Schuylkill"), where he arrived on April 26, 2010.  Id.

8.   The plaintiff remained at FCI Schuylkill until he received incident reports for encouraging a group demonstration and conduct interfering with the orderly running of the institution.  *Motion*, Ex. A, ¶ 5 and Attachment 2; *Response*, p. 6, § A; p. 2; Ex. A-1.  The Unit Disciplinary Committee recommended a transfer back to a high security institution.  Id.

9.   The plaintiff arrived at the Federal Transit Center in Oklahoma City on December 13, 2010, and was incarcerated there while awaiting transfer to the United States Penitentiary in Coleman, Florida ("USP Coleman").  *Motion*, Ex. A, ¶ 5; *Response*, p. 6, § A   The plaintiff arrived at USP Coleman on January 4, 2011.  Id.

10.   Inmates with religious dietary needs may request to be placed on the BOP's Religious Diet Program, which consists of two options.  *Motion*, Ex. A, ¶¶ 6-7 and Attachment 3, pp. 17-18, § 18a(1) and (2); Ex. B, ¶ 3; *Response*, p. 6, § B.

11.   One option provides for religious dietary needs through self-selection from the main line, which includes a no-flesh option and access to both the hot and cold salad bar.  *Motion*, Ex.

A, ¶ 7 and Attachment 3, pp. 17-18, § 18a(1); Ex. B, ¶ 3; *Response*, p. 6, § B.  The other option accommodates dietary needs through religiously certified processed foods, served on a pre-prepared tray,[6] with access to the cold salad bar only, and is known as the Common Fare Program.  *Motion*, Ex. A, ¶ 8 and Attachment 3, pp. 17-18, § 18a(1); Ex. B, ¶ 3; *Response*, p. 6, § B.  However, items from the cold salad bar are not certified religious foods.  *Motion*, Ex. B, ¶ 3.

12.   An inmate wishing to participate in the Religious Diet Program must submit an "Inmate Request to Staff Member" to Religious Services and be interviewed by a Chaplain. *Motion*, Ex. A, ¶ 6 and Attachment 3, p. 18, § 18a(2); Ex. B, ¶ 4; *Response*, p. 6, § B.  Based on the results of the interview, the inmate may be placed on the appropriate component of the Religious Diet Program.  *Motion*, Ex. A, ¶ 7 and Attachment 3, pp. 17-18, § 18a(1) and (2); Ex. B, ¶ 4; *Response*, p. 6, § B.

13.   The current religious menu offered through the Common Fare Program is known as the "Certified Food Menu," which has been in effect since 2008 and has not undergone any significant changes since that time.  *Motion*, Ex. B, ¶ 5; *Response*, p. 6, § B.

14.   At the time the plaintiff was housed at USP Florence in 2008 (when he filed this lawsuit), he requested and was approved to be on the Certified Food Menu.  *Motion*, Ex. B, ¶ 6; *Response*, p. 6, § B.

15.   The Certified Food Menu involves a rotating three-week menu that repeats at the end of each three-week period.  *Motion*, Ex. B, ¶ 7 and Attachment 1; *Response*, p. 6, § B.

16.   The Certified Food Menu is a uniform menu followed on a nationwide basis within the BOP and must be followed by each institution.  *Motion*, Ex. B, ¶ 8; *Response*, p. 6, § B.

---

[6]The trays are pre-prepared by an outside vendor in a certified religious manner.  *Motion*, Ex. A, ¶ 8 and Attachment 3, pp. 17-18, § 18a(1).

6

17.   The Certified Food Menu was developed and approved by the BOP's Central Office in Washington, D.C.  *Motion*, Ex. B, ¶ 9; *Response*, pp. 6-7, § B.  In arriving at religious menus, the BOP's Central Office Food Services and Religious Services staff work closely with outside religious entities to ensure that the meals provided meet religious dietary standards and also provide sufficient nutrition for inmates.  Id.

18.   The Certified Food Menu meals are prepared in a Kosher manner, which also meets Halal standards.  *Motion*, Ex. B, ¶ 10; *Response*, p. 7.  This menu advances the penological objectives of meeting the religious dietary needs of the maximum number of inmates with such needs.  Id.  Kosher is considered to be the strictest of all religious diets and thus food that is prepared in a Kosher manner will meet the dietary needs of most religions, including the Halal requirements for Muslims.  Id.  The Certified Food Menu diet also meets the U.S. Department of Agriculture's nutritional standards.  Id.

19.   Allowing each individual inmate or groups of inmates to specify the religious foods that the BOP will provide and the manner in which those foods will be prepared would impose significant burdens and costs.  *Motion*, Ex. B, ¶ 11; *Response*, p. 7.  There are nearly 175,000 inmates presently housed in BOP facilities.  Id.  These inmates have many different religious affiliations, including Catholic, Jewish, Nation of Islam, Muslim, Rastafarian, Mormon, and others.  Id.

20.   The BOP must make decisions regarding the religious diet that will satisfy the dietary needs (both religious and nutritional) of all inmates and still be economical and meet budgetary restrictions.  Id.  The BOP has legitimate penological interests in running a simplified food service that is economical and does not divert funding from other important penological

goals.  Id.  Allowing multiple groups to demand specialized diets would be extremely costly and create administrative burdens on the system.  Id.

21.    The BOP contracts with various vendors to prepare food trays that will be served as part of the Certified Food Menu.  *Motion*, Ex. B, ¶ 12; *Response*, p. 8.  These food trays are prepared by multiple vendors nationwide according to specifications dictated by the BOP.  Id. The vendors ensure that the meals are prepared in a Kosher manner, which also meets Halal standards.  Id.  Prior to the introduction of the Certified Food Menu in 2008, each individual institution's Food Services Department had to prepare and add foods to the religious food trays. Id.  This process added additional costs, required additional labor, and presented the risk of possible introduction of non-religious items to the food trays.  Id.

22.    The Certified Food Menu food trays are sealed and frozen before they are delivered to the institution.  *Motion*, Ex. B, ¶ 13; *Response*, p. 8.  Before they are served to inmates at USP Florence, the food trays are heated in an oven/steamer that is only used for religious diet foods. Id.

23.    The food trays contain separate compartments for meat and vegetables; however, the meat and vegetables are heated together.  *Motion*, Ex. B, ¶ 14; *Response*, p. 8.  The trays are disposable and not reused.  Id.

24.    Local institutions are not permitted to purchase or to provide alternative religious food trays to inmates.  *Motion*, Ex. B, ¶ 15; *Response*, p. 8.

25.    Each of the three meals every day contains a piece of fresh fruit, three slices of whole wheat bread, margarine, and either milk (for breakfast) or a kosher beverage (for lunch and dinner).  Breakfast on the Certified Food Menu every day contains a piece of fresh fruit, three slices of whole wheat bread, margarine, milk, and cereal; breakfasts are not served with

meat or fish.  *Motion*, Ex. B, ¶¶ 17-18 and Attachment 1; *Response*, p. 8.  Thus, an inmate who is on the Certified Food Menu diet, but who elects not to eat meat or fish, may eat the complete breakfast served each day.  Id.

26.    Three days of each week the lunch is a cold lunch.  *Motion*, Ex. B, ¶ 19 and Attachment 1; *Response*, p. 8.  Cold lunches include--in addition to fruit, bread, margarine, and a kosher beverage--potato chips and vegetable juice.  Id.  The cold lunches also include a protein serving, such as tuna, sardines, or bologna, which is separately packaged (wrapped in sealed plastic) from the rest of the lunch.  Id.

27.    Lunch each Sunday and on holidays is an omelet that does not include meat.  *Motion*, Ex. B, ¶ 20 and Attachment 1; *Response*, p. 8.  The other hot meals served for lunch (i.e., three days a week) have a meat entree, which is served with a starch and/or vegetables.  Id.

28.    Thus, an inmate who is on the Certified Food Menu diet, but elects not to eat meat or fish, is able to consume a piece of fresh fruit, three slices of whole wheat bread, margarine, and a kosher beverage for lunch each day.   *Motion*, Ex. B, ¶ 21 and Attachment 1; *Response*, p. 8.  Additionally, he is given an egg dish with potatoes one day a week and potato chips and vegetable juice three days a week.  Id.  He may also choose to eat the vegetable or starch provided three times a week with the hot tray.  Id.  Finally, he may self select items from the cold salad bar.  Id.

29.    Each Saturday, the dinner is a cold dinner that includes, in addition to the items mentioned above, peanut butter, jelly, potato chips, and vegetable juice.  *Motion*, Ex. B, ¶ 22 and Attachment 1; *Response*, p. 8.

30.    Three nights of each three-week rotation (an average of one night a week), a hot vegetarian meal is served for dinner: vegetarian chili, vegetarian cutlet, or vegetarian stuffed

cabbage.  *Motion*, Ex. B, ¶ 23 and Attachment 1; *Response*, p. 8.  One night a week is a fish

dinner.  Id.  Further, a vegetable and starch is served with each hot dinner.  Id.

     31.   Thus, an inmate who is on the Certified Food Menu diet, but elects not to eat meat

or fish, will be provided with a piece of fresh fruit, three slices of whole wheat bread, margarine,

and a kosher beverage for dinner each day.  *Motion*, Ex. B, ¶ 24; *Response*, p. 8.  Once a week, a

hot fish entree is available, and, once a week on average, the inmate will be provided a hot

vegetarian meal.  Id.  There is no meat with the meal served each Sunday night.  Id.  A

vegetarian inmate may also choose to eat the vegetable or starch provided five times a week with

the hot tray.  Id.  Finally, he may self-select items from the cold salad bar.  Id.

     32.   In total there are, on average, only seven meals a week in which a hot tray is served

that contains chicken, beef, or turkey.  *Motion*, Ex. B, ¶ 25; *Response*, p. 8.  No pork is ever

served with any of the Certified Food menu meals.  Id.

     33.   The Warden, Food Services Administrator, Assistant Food Services Administrator,

and Chaplain at USP Florence do not have the authority to offer the plaintiff a religious diet

other than the options described above (self-selection from the main line with a no-flesh option

or the Certified Food Menu).  *Motion*, Ex. B, ¶ 26; *Response*, p. 8.

     34.   Individual institutions are prohibited from making any changes to the Certified Food

Menu.  *Motion*, Ex. B, ¶ 27; *Response*, p. 8.  No one at the institution is personally involved in

preparing any of the foods provided to inmates on the Certified Food Menu or deciding what

foods will be provided.  Id.

     35.   Inmates are also permitted to purchase additional food items through the

commissary.  *Motion*, Ex. B, ¶ 28; *Response*, p. 8.  A number of those items are certified as

religious foods and are designated with the notation "{CR}" on the commissary list.  *Motion*, Ex. B, ¶ 28 and Attachment 2; *Response*, p. 8.

36.   There are a number of items available from the commissary that are not certified as religious and may contain pork, including sausage.  *Motion*, Ex. B, ¶ 29; *Response*, p. 8.  A number of other items contain meat.  Id.

37.   Inmates who are vegetarian have the following certified religious food items available for purchase: various types of rice, beans, beverages, peanuts, popcorn, chips, crackers, candy, tortillas, peanut butter, and condiments.  *Motion*, Ex. B, ¶ 30; *Response*, p. 8.

38.   Inmates who are on the Common Fare Program are instructed that it is their responsibility not to purchase foods from the commissary that they are not permitted to consume according to their stated religious dietary needs.  *Motion*, Ex. B, ¶ 31; *Response*, p. 8.  If an inmate who is on the Common Fare Program makes such purchases from the commissary, he is subject to removal from the Common Fare Program.  Id.

39.   When an inmate purchases food items at the commissary, BOP regulations prohibit the inmate from sharing, selling, or bartering the purchased food items to or with other inmates. *Motion*, Ex. A, ¶ 23; *Response*, p. 8.

40.   The plaintiff claims to be a member of the Nation of Islam, which encourages its members to be vegetarian.  *Motion*, Ex. C,  41:2-4, 42:1-3; *Response*, p. 9.

41.   The plaintiff claims that he obeys the Quran and that the diet he follows is prescribed by *How to Eat to Live*, Books One and Two, authored by Elijah Muhammed.  *Motion*, Ex. C,  43:5-10, 58:12-24; *Response*, p. 9.

42.   The plaintiff claims that his personal practices regarding his diet do not vary from those set forth in *How to Eat to Live*, and that he is in compliance with his religious requirements if he follows the diet set forth in *How to Eat to Live*. *Motion*, Ex. C, 43:13-21; *Response*, p. 9.

43.   According to *How to Eat to Live*, Nation of Islam members are prohibited from eating pork but are not prohibited from eating other meats or certain kinds of fish.  Specifically, *How to Eat to Live* states that "[i]t is not a sin for you to eat meat," including beef, lamb, camel, horsemeat, and rabbit. *Motion*, Ex. A, Attachment 6, p. 61; p. 25 (stating that if meat is eaten, "eat clean, fresh meat whether it is beef, lamb or chicken"); Ex. A, Attachment 7, p. 78 (stating that "[i]t is not a sin for us to eat [beef and lamb]"). *How to Eat to Live* states that "there are many fish we can eat . . . we should confine our fish eating to those fish weighing between one and ten pounds." *Motion*, Ex. 6, p. 60.  However, game meat should not be eaten. <u>Id.</u> at pp. 61-62; Ex. 7, p. 9.

44.   *How to Eat to Live* says that Nation of Islam followers may eat the same foods as the Orthodox Jews who follow a Kosher diet. *Motion*, Ex. 6, p. 24; *Response*, p. 9.  It explains that "[t]he Holy Qur-an teaches use that we can eat their food and they can eat our food, because the two people (Jews and Muslims) try to eat the right food to live." <u>Id.</u>  "A Muslim, according to the Holy Qur-an, should not fear to eat food that the Jews eat." *Motion*, Ex. 6, p. 67; *Response*, p. 9.

45.   *How to Eat to Live* states that Nation of Islam followers may not eat the following:

a.   Any type of pork. *Motion*, Ex. 6, p. 61 ("it is a sin for you to eat the meat of the hog"); Ex. 7, p. 77 ("Allah forbids us to eat the flesh of the swine"); *Response*, p. 9.

b.   Nuts.  *Motion*, Ex. 6, p. 8 ("[p]ositively eat no nuts"); p. 65 ("Stay off those peanuts, coconuts, and nuts–period"); Ex. 7, p. 96; *Response*, p. 9.

c.   Corn bread, corn muffins, corn hot cakes, popcorn, or other corn products (other than corn milk).  *Motion*, Ex. 6, p. 6 ("He flatly forbids us to eat corn bread"); id. ("Positively do not eat corn bread"); id. at p. 65 ("The corn is fit for you only in its milk stage"); Ex. 7, p. 96 ("Do not eat popcorn"); *Response*, p. 9.

d.   "Scavengers of the sea, such as oysters, crabs, clams, snails, shrimp, eels, or catfish." *Motion*, Ex. 6, p. 61; Ex. 7, pp. 67, 78; *Response*, p. 9.

e.   Fish weighing over 50 pounds, including canned tuna.  *Motion*, Ex. 6,  p. 90; Ex. 7, p. 77 ("Allah forbids us to eat . . . a fish weighing over 50 pounds (or even weighing 50 pounds)"); *Response*, p. 9.

f.   Peas.  *Motion*, Ex. 6, p. 4 ("Allah forbids us to eat peas"); *Response*, p. 9.

46.   According to *How to Eat to Live*, a diet of the "right foods" consists of milk, bread, and navy beans.  *Motion*, Ex. 6, p. 64; *Response*, p. 9.

47.   Nation of Islam members are permitted to eat cheese and eggs.  *Motion*, Ex. C, 51:5-8; *Response*, p. 9.

48.   There is nothing in *How to Eat to Live* that prohibits Nation of Islam members from consuming vegetables that were prepared in close proximity or in the same pans as non-pork meats.  *Motion*, Ex. 6 and Ex. 7; *Response*, p. 9.

49.   The plaintiff testified that he may eat vegetables that are not otherwise prohibited as long as they are prepared in a Halal (non-Haram) manner--*i.e.*, prepared in a manner that does not place the vegetables in contact with any sort of pork product or with utensils or pans that have been in contact with pork.  *Motion*, Ex. C, 48:11-15; *Response*, p. 9.

50.   The plaintiff states that he may eat vegetables that were placed on the same tray with fish. *Motion*, Ex. C, 127:3-17; *Response*, p. 9.  However, he claims that he cannot eat vegetables that are warmed on the same tray as meat because as the food trays are heated in the microwave, "fumes from the flesh seeps into the vegetable section, thus contaminating those vegetables, making them unfit for a vegetarian to consume." *Complaint*, p. 9.

51.   The plaintiff is also not allowed to eat pasta or any processed food "unless we absolutely have to," and is discouraged from drinking soda. *Motion*, Ex. C, 51:25-52:6; 56:13-16; *Response*, p. 10.  He claims that he never drinks soda. *Motion*, Ex. C, 52:10-11; *Response*, p. 10.

52.   The plaintiff may eat anything that is available, including pork, if there are no other options. *Motion*, Ex. C, 67:10-17; *Response*, p. 10.

53.   The plaintiff testified that he has been able to supplement his diet by purchasing items from the commissary and obtaining additional vegetables through inmate friends who work in the prison kitchen. *Motion*, Ex. C, 183:6-19; *Response*, p. 10.

54.   The plaintiff testified that he has not had any health problems related to his nutrition since December 2008, when he was hospitalized after engaging in a religious fast. *Motion*, Ex. C, 183:24-184:7; *Response*, p. 10.

55.   The plaintiff is 5'5" in height. *Motion*, Ex. C, 36:14-15; *Response*, p. 10.  His weight was 156 pounds at the time of his deposition in late October 2010, which he considers to be normal and "about where I want to be." *Motion*, Ex. C, 37:12-16; *Response*, p. 10.

56.   According to the plaintiff's commissary records, since 2006 he has purchased a number of items that are not certified religious and are not vegetarian, including hot & spicy sausage, chicken breast, roast beef, summer sausage, and chili with beans. *Motion*, Ex. A, ¶ 18;

14

Attachment 8, pp. 14, 15, 18 of 28; Attachment 9, pp. 6, 11 of 21; Attachment 10, p. 2 of 13; *Response*, pp. 10-11.

57.   During the years 2006 and 2007, the plaintiff purchased nearly 800 cans of soda. *Motion*, Ex. A, ¶ 20; Attachment 8, pp. 1, 2, 9, 10, 15 of 28; *Response* pp. 10-11.

58.   Although the plaintiff claims that he is not allowed to eat nuts, he purchased the following items from the commissary: peanut butter, Peanut M&Ms, Hershey's Bar with Almonds, Whatchamacallit candy bars, Snickers candy bars, Reese's Peanut Butter Cups, Reese's Pieces, chocolate pecan sandies, chocolate covered peanuts and clusters, peanut butter and butter pecan ice cream, and peanut butter cookies.   *Motion*, Ex. A, ¶ 21; Attachments 8, 9, 10; *Response*, p. 11.

59.   The plaintiff has purchased tuna, clams, and items containing corn from the commissary, all of which are also prohibited by his religion.   *Motion*, Ex. A, ¶¶ 19, 22; Attachment 8, pp. 14-19 of 28; Attachment 9, pp. 1, 13, 15 of 21; Attachment 10, pp. 6, 13 of 13; *Response*, p. 11.

60.   The plaintiff violated the BOP's rules regarding the religious diet by taking non-religious drinks from the main-line on two occasions.   *Motion*, Ex. A, ¶ 11 and Attachment 5; *Response*, p. 12.   He was removed from the BOP's religious diet program for these violations and has not sought to be placed back on the program.   *Motion*, Ex. A, ¶ 11; *Response*, p. 12.

# IV.  ANALYSIS

## A.  First Amendment, RLUIPA, and RFRA Claims

RLUIPA provides that "[n]o government[7] shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability" unless the government demonstrates that the burden is "in furtherance of a compelling governmental interest" and is "the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a).  In order to proceed under a RLUIPA claim, a plaintiff must demonstrate that "he wishes to engage in (1) a religious exercise (2) motivated by a sincerely held belief, which exercise (3) is subject to a substantial burden imposed by the government." Abdulhaseeb v. Calbone, 600 F.3d 1301, 1312 (10th Cir. 2010).  The same elements must be demonstrated in a claim under RFRA. Id. at 1313.

A plaintiff must "produce[] prima facie evidence to support a claim alleging a violation" of the Free Exercise Clause of the First Amendment or a violation of RLUIPA.  42 U.S.C. § 2000cc-2(b).  The government bears "the burden of persuasion on any element of the claim, except that the plaintiff shall bear the burden of persuasion on whether [the challenged practice] substantially burdens the plaintiff's exercise of religion." Id.

Thus, to establish a violation of the First Amendment, RFRA, and RUILPA, the plaintiff bears the initial burden of demonstrating that the restriction substantially burdened his sincerely held religious beliefs. Abdulhaseeb, 600 F.3d at 1312; Boles v. Neet, 486 F.3d 1177, 1182 (10th Cir. 2007); 42 U.S.C. § 2000cc-2(b).

---

[7]The term "government" includes "the United States, a branch, department, agency, instrumentality, or official of the United States, and any other person acting under color of Federal law." Id. at § 2000cc-5(4)(B).

Here, the plaintiff claims that his personal practices do not vary from those set forth in *How to Eat to Live*, which encourages vegetarianism; that based on the teachings of *How to Eat to Live*, he sincerely believes he must eat a halal vegetarian diet; and that his belief is not satisfied by the BOP's Religious Diet Program. *Response*, pp. 5-6.  He attaches to his Response several supporting exhibits.  Id. at Attachment 2, Doc. 111-1, p. 12, ¶ 4 (affidavit of plaintiff which states that "[i]t is a religious requirement that all healthy adult members follow the religious dietary laws, as put forth in *How to Eat to Live*, books I and II"); Attachment 3, Doc. 111-1, p. 25 (Reprint from *How to Eat to Live*, Book Two, stating "[d]o not be a meat consumer" "[b]e a vegetarian"); Attachment 4, Doc. 111-1, p. 35 (letter from Louis Farrakhan to followers stating that Elijah Muhammad taught that "no meat or flesh was good for us").

However, the defendants have provided undisputed evidence that the plaintiff has purchased from the commissary a number of items that are not certified religious and are not vegetarian, such as hot & spicy sausage, chicken breast, roast beef, summer sausage, and chili with beans.  The plaintiff responds to this evidence by attesting that he "has been a strict vegetarian almost since the day [he] decided to become a member of [the Nation of Islam]" in 1965.  *Response*, Attachment 2, Doc. #111-1, ¶¶ 3-4.  See also *Complaint*, p. 4.  Therefore, the plaintiff has created a material fact dispute regarding whether he is a vegetarian.

The defendants have demonstrated with unrefuted evidence, however, that the plaintiff does not comply with all of the dietary practices which he claims are essential to his faith. Specifically, the plaintiff testified that his personal practices regarding his diet are set forth in Books One and Two of *How to Eat to Live*, and that his personal practices do not vary from those books.  *How to Eat to Live* states that Nation of Islam followers may not eat nuts, corn products (except for corn milk), clams, and tuna.  It is undisputed that the plaintiff has purchased

17

from the commissary peanut butter, Peanut M&Ms, Hershey bars with almonds, Whatchamacallit candy bars, Snickers candy bars, Reese's Peanut Butter Cups, Reese's Pieces, chocolate pecan sandies, chocolate covered peanuts and clusters, peanut butter and butter pecan ice cream, peanut butter cookies, tuna, clams, and items containing corn.  It is further undisputed that plaintiff states that followers of Nation of Islam are discouraged from drinking sodas, but that during 2006 and 2007 the plaintiff purchased nearly 800 cans of soda.  Finally, it is undisputed that the plaintiff was removed from the Religious Diet Program for taking non-religious drinks from the main food line on two occasions.

The plaintiff argues that simply because he "purchased something from the prison's commissary certainly doesn't mean that he consumed it himself." He states that inmates purchase food with which to barter; to bring to "inmate celebrations" and sporting events; "to help out someone who is less fortunate"; and "to pay for serves rendered, etc." *Response*, p. 11.  However, the plaintiff has failed to state directly and unequivocally that he did not personally consume the forbidden items which he purchased from the commissary.  He provides only affidavits which state generally that bartering is a way of life in prison.  Id. at Attachment 2.  I cannot reasonably conclude from the vague and conclusory statements provided by the plaintiff that even if the plaintiff maintained a strict vegetarian diet he did not consume the remaining forbidden food items which he purchased from the commissary.

The First Amendment, RLUIPA, and RFRA require a plaintiff to make a prima facie showing of a sincere religious belief.  The plaintiff has not met his burden to establish a prima facie case regarding whether he has sincere religious beliefs based on the *How to Eat to Live* books.  The unrefuted evidence concerning his commissary purchases establishes, to the contrary, that the plaintiff's asserted religious beliefs, insofar as they concern limitations on his

18

diet as set out in the *How to Eat to Live* books, are not sincerely held.  The Motion should be granted insofar as it seeks dismissal of the plaintiff's First Amendment, RLUIPA, and RFRA claims.[8]

### C.   Equal Protection

The Fourteenth Amendment provides that "[n]o State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. Amend XIV, § 1. "[T]he Fifth Amendment imposes on the Federal Government the same standard required of state legislation by the Equal Protection Clause of the Fourteenth Amendment."  Schweiker v. Wilson, 450 U.S. 221, 227 n.6 (1981).

"To sustain a claim under the Equal Protection Clause, a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class.  Marshall v. Columbia Lea Reg'l Hosp., 345 F.3d 1157, 1179 (10th Cir. 2003) (citing Adm'r of Mass. v. Feeney, 442 U.S. 256, 272-74 (1979); Village of Arlington Heights, 429 U.S. 252, 264-65 (1977)).

The plaintiff does not provide any evidence to show that the defendants acted with an intent or purpose to discriminate against the plaintiff based on his membership in the Nation of Islam. *Response*, p. 35.  Moreover, it is undisputed that the decision to offer Nation of Islam members the Common Fare Program is motivated by efficiency and cost considerations and not by an intent to discriminate.   The Motion should be granted insofar as it seeks summary judgment on the plaintiff's equal protection claims.

---

[8]Because I find that the plaintiff has not met his burden to demonstrate a sincerely held religious belief, I do not address the defendants' remaining arguments.

## V.  CONCLUSION

I respectfully RECOMMEND that the Motion [Doc. # 102] be GRANTED and that summary judgment enter in favor of the defendants on all of the plaintiff's claims.

FURTHER, IT IS ORDERED that pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed.R.Civ.P. 72(b), the parties have 14 days after service of this recommendation to serve and file specific, written objections.  A party's failure to serve and file specific, written objections waives *de novo* review of the recommendation by the district judge, Fed.R.Civ.P. 72(b); Thomas v. Arn, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions.  In re Key Energy Resources Inc., 230 F.3d 1197, 1199-1200 (10th Cir. 2000).  A party's objections to this recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review.  United States v. One Parcel of Real Property, 73 F.3d 1057, 1060 (10th Cir. 1996).

Dated May 24, 2011.

BY THE COURT:

 s/ Boyd N. Boland
United States Magistrate Judge